FILED

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C. A. No.

```
*********************************
KENNETH L. NICHOLS,              *
       Plaintiff                 *
                                 *
                                 *
    v.                           *          COMPLAINT
                                 *
                                 *
JOHN ASHCROFT,                   *
ATTORNEY GENERAL,                *      04 CV 11341 PBS
DEPARTMENT OF JUSTICE,           *
       Defendant                 *
*********************************
```

MAGISTRATE JUDGE Collings

1. Plaintiff Kenneth L. Nichols ("Nichols") asserts his claim pursuant to Section 501 of the Rehabilitation Act of 1973 (29 U.S.C. §791 et seq.). He resides in Gardner, Massachusetts.

2. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1331.

3. Venue in the District of Massachusetts is proper under 28 U.S.C. §1391(b). The employment practices hereafter alleged to be unlawful were committed in the Commonwealth of Massachusetts.

4. Defendant John Ashcroft is the Attorney General of the U.S. Department of Justice. The Bureau of Prisons is an agency within the U.S. Department of Justice.

5. Kenneth L. Nichols served for ten years with the United States Army working within the Human Resources arena. His primary military occupation and title at the time of his separation was 75B20, Personnel Administration Specialist. His dates of service were from September 3, 1981, to October 31, 1991, when he received an Honorable Discharge.

1

6. After his discharge, Nichols was awarded a service connected disability rating of 10%, effective December, 1991. The basis for his disability was Tarsal Tunnel Syndrome in both feet. This caused Nichols to have constant pain in his feet radiating up his legs. Effective June, 1997, his disability rating was increased to 30% due to increased aggravation of foot pain and migraine headaches. Effective December, 2002, it was increased to a rating of 60% disabled with a compensation rate of 50%. His condition continues to this day – pain in his feet and migraine headaches.

7. Nichols began employment with the Federal Bureau of Prisons effective September 22, 1991.

8. The Bureau of Prisons has an affirmative action obligation to hire and promote disabled veterans like Nichols.

9. The Bureau of Prisons understood and considered Nichols to be a "disabled veteran."

10. During his service with the Bureau of Prisons Nichols has held the following positions and grade levels within the Agency:

Correctional Officer, GS-007-6, from September 23, 1991, to March 21, 1992, at FCI Tallahassee, Florida;

Correctional Officer, GS-007-7, from March 22, 1991, to May 16, 1992;

Inmate Systems Officer, GS-007-7, from May 17, 1992, to October 1, 1994;

Human Resource Specialist (Trainee), GS-201-7, from October 2, 1994, to March 2, 1996, at FCI Texarkana, Texas;

Human Resource Specialist, GS-201-9, from March 3, 1996, to April 25, 1998, at FMC Forth Worth, Texas;

    Assistant Human Resource Manager, GS-201-11, from April 26, 1998, to August 14, 1999, at FMC Devens, Massachusetts;

    Administrative Management Specialist, GS-301-11, from August 15, 1999, and thereafter at FMC Devens, Massachusetts.

11. Nichols served as a Corrections Officer despite his disability. At no time did Nichols' disability prevent him from performing his day to day duties in any of the above positions.

12. Federal Medical Center Devens is located in Devens, Massachusetts. It is part of the Bureau of Prisons.

13. David L. Winn is the Warden for Federal Medical Center Devens. He has held that position for the last three years. He arrived at FMC Devens approximately two years after it was opened.

14. FMC Devens is a large facility with a camp adjacent to the institution and a warehouse several miles away.

15. In his last position at FMC Devens Nichols served as the Volunteer Coordinator. On a day to day basis Nichols was in charge of all aspects of administering the volunteer program for the institution, as well as maintaining the medical staff contractors for the Health Services Unit of the institution. Other collateral duties included EEO and affirmative action.

16. The Position Description for Nichols' job lists the Physical Demands as being "mostly sedentary. Some walking, bending and lifting will be required."

17. Nichols was the only person in this position. The Position Description was in fact drafted for him. The position was located in the Health Services Unit, which is within the secure area of the Federal Medical Center.

18. Many departments and positions at the Federal Medical Center, however, are located outside the secure area of the institution, including the Human Resources Department, the Business Office, the Warden's Office, the Legal Services Department, the Employee Development Staff and the Institution Mail Room.

19. Nichols' Position Description says he is "charged with responsibility for maintaining security of the institution." This responsibility appears in all position descriptions at the Medical Center as well as all position descriptions for the entire Bureau regardless of where the positions are physically located.

20. In fact, however, the obligation to maintain security varies according to the job location. If there is an emergency within the secure confines of the institution, an alarm called "deuces" is set off. Staff in the administrative buildings are required to respond only by going to the control room sally port area (the entrance to the secure area) and wait there, if needed. Staff in the administrative buildings are not obligated to go into the secure area of the institution. This is true also for the Human Resources staff, the Business Office staff, the Warden's Office staff, and the Legal Department staff and the Warehouse staff, the latter two being located 4.5 miles away from the institution. Similarly, the Employee Development Department staff does not need to respond inasmuch as they are located in the Staff Training Center adjacent to the camp facility approximately a quarter of a mile from the institution.

21. While Nichols was at FMC Devens, he has been called upon to respond to emergencies only on a very limited number of occasions. If there was a general call for a emergency response when "deuces" sounded, staff were required to run. Typically, after the first eight or ten people got there, all other staff were told to stand down. This is what has always happened

to him. Nichols' best estimate is that this has happened probably about eight to ten times during his five year career at FMC Devens.

22. On August 1, 2000, Nichols underwent foot/ankle surgery for Tarsal Tunnel Release, due to the military injury for which he had been receiving disability compensation. This surgery was for a release trying to alleviate some of the pain he was experiencing. The surgery caused Nichols to be out for work from August 1, 2000, to December 14, 2000.

23. During his absence from work Nichols utilized his own annual and sick leave accrual balances, employee donations and donations from the Department of Justice Leave Bank in order to cover his period of absence.

24. When Nichols returned to work, he was placed in a temporary limited duty status. He was assigned to the Business Office. Prior to that he was working in the Health Services Unit inside the secure area of the institution.

25. In this "limited duty" status Nichols was able to perform all of his regular duties. He simply was not permitted to enter secure areas of institution, which "limitation" did not prevent him from performing all of his regular job duties. However, when it was convenient for management, he was allowed to enter inside the secure confines of the institution just past the control sally port into the inmate Visiting Room in order to conduct, monitor and supervise quarterly blood drives. Nichols did not otherwise have to go inside the secure area of the institution in order to perform his normal duties as a Volunteer Coordinator.

26. This practice is fairly standard. Under FMC Devens' limited duty program, employees who have physical limitations are simply placed in locales where the likelihood of having to respond to an emergency was diminished.

27. On February 4, 2002, Nichols was issued a proposal letter for removal based upon the Bureau allegation of his being physically unable to perform the duties of his position since 8/7/00.

28. On March 14, 2002, Nichols sent a rebuttal to this proposed removal. In his rebuttal Nichols contended that he could perform the essential elements of his position in that the ability to run is not an essential element of his position; over the years the instances when Nichols had to run in order to respond to emergencies had been extremely limited in number. Even so, he contended that he could perform that task as the need arose. If he did this task, he would only suffer increased pain; there was no risk of further injury. The pain would not cause any permanent change in his condition.

29. In his rebuttal Nichols also asked for reasonable accommodations; he wanted to be reassigned, promoted, if necessary paid any and all costs for his relocation, or placed outside the secure areas of institution, where as a practical matter the need to respond does not exist. During Nichols' career at FMC Devens the staff outside the secure area of the institution have never had to enter the secure area to respond to emergencies.

30. On June 19, 2002, John Harris, III, M.D., released Nichols to full duty with the aid of venous support hose and/or pneumatic stirrup on his left ankle, and Nichols returned to full duty status within the secure area of the institution. The issue as to Nichols' removal thereby became moot.

31. On Saturday, December 21, 2002, while walking en route to the Staff Training Center (on Government Property), Nichols slipped and fell on "Black Ice" while carrying files and equipment weighing approximately 45 to 50 pounds, at which time he suffered work-related-

injuries to his lower back region and left thumb.

32. On January 6, 2003, Nichols returned to work and was placed on limited duty status.

33. Nichols was again assigned to work in the Business Office. As stated, this is outside the secure area of the institution where Nichols was not required to respond to emergencies. Again, Nichols could and did perform from the Business Office all of his day to day duties as the Volunteer Coordinator, EEO Counselor, and Health Services Contract Program Manager.

34. Assigning Nichols to the Business Office, not just reduces, but eliminates the likelihood that Nichols would have to respond to an emergency.

35. On January 31, 2003, Nichols was advised that his limited duty assignment would be effective until he was re-evaluated by his physician on February 10, 2003.

36. On July 16, 2003, Nichols was advised that his limited duty status would be terminated on August 5, 2003. The letter from Matthew Langford, Acting, Executive Assistant, (Nichols' recently appointed immediate supervisor) included the following statement: "You can substantiate your current medical status by either seeing the institution physician or providing documentation from your personal physician, or both. You are not however, required to see either of these physicians."

37. Between January 6, 2003, and July 16, 2003, Nichols' physical condition and his ability to do his job had not changed.

38. On July 22, 2003, Nichols provided the Bureau of Prisons with an updated medical report from Dr. Ayers. Dr. Ayers' letter included the following statements:

"The patient injured his back on the 21st of December, 2002, after a slip and fall while

carrying a 50 lb. Box at work. The patient has undergone an MRI which looked quite good. We are awaiting an electromyogram to see if indeed there are any neurologic issues. He does have a history of bilateral tarsal tunnel which is also giving him a problem. The patient's symptoms are primarily pain and limited motion with a presumptive diagnosis of sciatica. There is no expected date of full or partial recovery, with the patient not showing any improvement with all conservative management and no indication for need for surgery. The patient's pain does appear to have an impact on the patient's life, in that in his job as a prison guard, he really could not defend himself or pull people away from a hazardous area. The patient is also limited in what he is able to do at home. I cannot give a narrative explanation of medical basis for any conclusion that the medical condition has become well stabilized. I think an electromyogram will give us an idea as to whether or not this is a neurologic issue. The patient has fairly limited motion with difficulty walking, so he would be incapacitated during a period of increased physical activity, such as would be required by his job as a prison guard."

39. Despite Dr. Ayers' notation, Nichols was not a prison guard, and Warden Winn was fully aware of this when he read this letter.

40. Nichols' physical condition and limitations have not changed regarding his leg and pain since Dr. Harris released Nichols to return to work. On some days, the pain is not as excruciating as others; on some days Nichols is fine, and on other days he is in pain, depending on the weather. It still is the case that if Nichols were required to run or grapple with someone, he would merely experience increased pain, which would lessen after a time.

41. On August 21, 2003, Nichols was issued a proposal letter to be removed from his position as Administrative Management Specialist, GS-301-11, for the charge of Physical/Medical Inability to Perform the Duties of his Position.

42. In this proposed removal Warden Winn claimed that "every employee in a correctional institution must be able to respond to emergencies immediately and must be able to assist in the resolution of the emergency."

43. Warden Winn proposed removing Nichols because he "felt" that Nichols couldn't respond

to emergencies if one arose in the institution. In Warden Winn's mind, it was essential, if they had an emergency, that Nichols would have to respond. In fact, in his opinion, the primary job function of all Bureau of Prison employees is to respond to emergencies.

44. Warden Winn based his decision to remove Nichols because of Nichols' medical condition.

45. In fact, not all employees at the Medical Center have to respond in the manner that Correctional Officers might have to respond to an emergency. This is true of the Warden's Office, the Business Office, Human Resources, the Warehouse staff, the Garage staff, the Legal Office staff, the Mail Room staff, and the Employee Development Staff/Staff Training Center.

46. When Nichols was given the letter of proposed removal, he was informed by Matt Langford, Acting Executive Assistant, as Nichols' recently appointed immediate supervisor, that Nichols must immediately depart the grounds of FMC Devens per the order of Warden Winn.

47. Nichols requested administrative leave. Langford instead gave Nichols the option of either taking annual leave, sick leave or leave without pay. Nichols opted to utilize his own leave in order to maintain a paycheck. Nichols stayed on his own annual leave until approximately September 22, 2003, when it ran out.

48. On August 21, 2003, Nichols provided a response to the proposed removal action. In this response Nichols requested, inter alia, that his position be relocated to the Staff Training Center or the Institution Warehouse Building, specifically in the vacant administrative office next to the Legal Services Department, as an accommodation because these are Agency areas where there are no prisoners other than for temporary sanitation duties (i.e., to empty

9

trash and/or vacuum the floors).

49. Nichols also requested additional time to respond. Without explanation, Warden Winn denied that request despite the fact that Dr. Ayers had written: "We are awaiting an electromyogram."

50. On August 22, 2003, Warden Winn also denied Nichols' request for accommodation. Warden Winn claimed that the request was "not a reasonable accommodation that would enable you to perform the essential functions of your position, i.e., responding to emergencies." Implicitly, Warden Winn thereby acknowledged that people at the Staff Training Center or the Institution Warehouse Building do not have to respond to emergencies.

51. Neither Warden nor anyone on his behalf ever engaged in any discussion with Nichols about alternate kinds of accommodations.

52. FMC Devens has a Chief Medical Officer. Because Warden Winn is not a medical doctor, he normally gets the Chief Medical Officer involved in providing advice as to what is the best position in which to place an injured employee who cannot respond to emergencies. Yet, in this instance Warden Winn's sole basis for his removal action was the July 22, 2003, letter from Dr. Ayers and Nichols' response to the proposed removal. Warden Winn did not have Nichols examined by another physician. Neither did Warden Winn review the physical requirements for Nichols' position as listed in his job description before he removed Nichols from his position.

53. On September 16, 2003, during a telephonic conversation with Cynthia A. Lord, Human Resource Manager, Nichols verbally requested a formal written notification, certifying that

he had in fact been barred from the institution grounds effective August 21, 2003, per the order of Warden Winn. Lord informed Nichols that she would speak to the Warden and get back with him; however, she could not make the Warden change his mind or tell him what to do. Lord never got back to Nichols.

54. By letter dated September 18, 2003, Nichols was removed from his position with the Bureau of Prisons, effective September 22, 2003, by David L. Winn, Warden. In this removal Warden Winn asserted that: "There are no positions with the Federal Medical Center where you would not present a risk to your safety or the safety of others."

55. However, there were several vacant offices in the Warden's area and in the Administrative Office area, all of which are located outside the secure area of the institution. Nichols could have been moved there.

56. Also, the position of Employee Development Specialist, located in the Staff Training Center within the employee development staff was vacant, and Nichols was qualified for this position.

57. No one ever discussed with Nichols the idea of moving to these other offices or taking this vacant position.

58. On September 22, 2003, Nichols resubmitted another request for Reasonable Accommodation on DOJ Form 100A. Nichols was not able to deliver the document until approximately 4:10 p.m. that day. However, Nichols had earlier called the Acting Personnel Officer named Lisa Albee and informed her that he was attempting to deliver the document prior to 4:00 p.m. Nichols managed to deliver it to Albee while she was still within the FMC Devens parking lot.

59. Nevertheless, by letter dated September 25, 2003, Warden denied this last request as being filed too late.

60. Effective September 22, 2003, Nichols was removed from his position as Administrative Management Specialist, GS-301-11, Step 5, for the following charge: Physical/Medical Inability to Perform the Duties of his Position.

61. Nichols was not accepted to the periodic rolls of worker's compensation until October 3, 2003.

62. On December 30, 2003, Dr. Ayres again examined Nichols. At this time he stated:

"I am writing regarding Kenneth Nichols, whom I have been following for back and leg pain since the 10th of February 2003 after a slip and fall while carrying a 50 lb. box at work on 21st of December, 2002. After multiple forms of treatment, second opinions, and multiple tests, it is felt that the patient does have a mechanical low back derangement with radiation to both legs as far as the knees without neurologic loss. I think he has come to a medical end result. His medical condition has seriously affected his activity and home life. It affects his job, in that he might be able to do more light duty activity, but if it comes to having to defend himself in prison or help someone else in jeopardy, he may end up hurting himself significantly or not being able to help another person that is dependent on him. Medical basis for my conclusion is by multiple evaluations with fairly consistent findings. This is more a matter of limitation of motion, consistent symptoms, etc. The patient is not expected to experience sudden or subtle incapacitation as a result of his medical condition but persistent consistent disability which would involve prolonged standing, lifting, pulling, pushing, twisting, etc."

63. Nichols during his career at the Federal Medical Center has almost never had to grapple with a prisoner. Only a few times has he had to even run, or walk quickly, toward the sally port. And on the few occasions that has occurred, he has been "called down."

64. Administrative employees seldom, if ever, have been required to run and grapple with prisoners. This function is not even required or expected of persons based away from the institution.

65. Michael Sheridan is a Case Manager for the Bureau of Prisons. Sheridan was hired by the Bureau of Prisons in September, 1995, at FCI Danbury, Connecticut, as a Correctional Officer. He was hired with the Bureau knowing that he has a form of Muscular Dystrophy called CMT disease that affects his hands and feet. In June, 1998, Sheridan was transferred to FMC Devens. In 1999 Sheridan was promoted to the position of Case Manager, with the following responsibilities: counseling inmates, assisting them with their release preparation, programming within the institution, correspondence with judges and probation and the like.

66. Sheridan's positions as a Correctional Officer and as a Case Manager have always been within the secure area of the institution at both FCI Danbury and FMC Devens, with exception of periodic rotation at the camp facilities of both institutions.

67. During Sheridan's his career he has never had to respond to an emergency situation where he had to physically restrain an inmate.

68. Some staff members of FMC Devens are not required to respond to emergencies simply based on their physical location, type of work, office location, area/section of the institution to which an alarm has been noted, including the following: Human Resources staff, Legal Services staff, Warden's staff, Business Office staff, Mail Room staff, Warehouse staff, Employee Development staff and the staff assigned to the Camp.

69. All of these staff and work office locations are outside of the secure confines of the institution. The institution at FMC Devens is in fact zoned off. If there is an emergency in one zone of the secure area, only persons in that zone are to respond; everyone else is to stay in their location unless it turned out to be a full-blown riot and they were told to respond. Those persons based outside the secure area need only go to the sally port. Persons in the

Personnel Office, for example, must only stand ready to respond. In fact, there has not been any occasion when there was such an emergency that persons from, for example, the Human Resources offices actually had to go into the secure area of the Medical Center to deal with the emergency (unless the individual happened to be within the secure confines of the institution at the time of the alarm.).

70. Persons from the warehouse and the camp have never come into the secure area of the institution to respond to an emergency. The administration building is connected to the secure area of the institution by means of a tunnel, but the warehouse and the camp are unattached and further beyond the institution.

71. Immediately prior to a current workman's compensation status, Sheridan was assigned to the outside camp facility. At the camp he was not required to respond emergency alarms or situations that occur within the secure confines of the institution.

72. If there is an emergency, employees are made aware of that fact by radio. Certain radios are fixed with a body alarm. If that is pushed, it rings in the control room and tells the control room which employee it is and where he works. The control room then puts out a call over the radio system that there is an emergency in a certain area. However, there are not enough radios to accommodate all staff members that are inside the secure area of the institution. There are also staff members who are normally assigned outside the secure area who do not have radios either.

73. Mark Shaunessy is a Correctional Officer. Shaunessy was hired by the Bureau of Prisons in May, 1995, at FCI Danbury, Connecticut, as a Correctional Officer. In 1999 Shaunessy was transferred to FMC Devens as a Correctional Officer. Shaunessy's position as a

Correctional Officer has always been within the secure area of the institution at both FCI Danbury, Connecticut, and FMC Devens.

74. Shaunnessy has responded to approximately three emergency situations that involved restraining an inmate while assigned to FCI Danbury, Connecticut, or FMC Devens.

75. During his tenure at FMC Devens, Shaunnessy has never observed employees who are based in the administrative offices or the business office enter the secure area for the purpose of helping respond to an emergency.

76. The main emergency notification system at the institution is an institution radio. However, not all employees assigned to FMC Devens are offered the opportunity to carry a radio due to the lack of enough radios to go around for each staff member.

77. During Shaunnessy's tenure at FCI Danbury, a disabled employee bound to a wheel chair worked within the secure confines of the institution within the mailroom.

78. Given Nichols' medical condition and the nature of his work involved, there is little probability that his condition may result in injury to himself or others.

79. Nichols is a "disabled person" who has a physical or mental impairment that substantially limits one or more of the major life activities -- walking, who has record of such an impairment, and/or who was regarded as having such an impairment.

80. The Bureau of Prisons regarded Nichols as substantially impaired in a class of jobs and a broad range of jobs in various classes as compared with the average person having comparable training, skills, and abilities.

81. If Nichols were required to run and grapple with prisoners, he would experience greater pain than he normally experiences on a day-to-day basis. However, he would suffer no injury,

permanent or otherwise.

82. The Bureau of Prisons did not make a good faith, individualized inquiry into Nichols' impairment, sufficient to inform itself of his limitations.

83. The Bureau of Prison's assumptions about Nichols' disability were unreasonable and not based upon a good-faith assessment of Nichols' capabilities.

84. The Bureau of Prisons did not provide reasonable accommodations to Nichols' physical limitations.

85. Nichols could perform the essential functions of the job, with or without reasonable accommodation. Responding to emergencies by running and grappling with prisoners is not an essential function of Nichols' position or of all other positions at the Federal Medical Center.

86. Nichols could safely perform all of the essential functions of his job.

87. The Bureau of Prisons failed/refused to enter into an interactive process with Nichols to determine an appropriate accommodation. All it did was to quickly deny Nichols' request for accommodation without engaging in any discussion whatsoever with him.

88. Reasonable accommodations to Nichols' disability were readily available. The Bureau of Prisons could have relocated his position from inside the secure area of the Medical Center to any of a number of sites outside the secure area of the Federal Medical Center. Nichols could perform all of his duties as a Administrative Management Specialist from any of these sites outside the secure area of the Federal Medical Center. During the entire history of the Federal Medical Center no administrative personnel has ever had to even enter the secure area of the Medical Center in order to respond to an emergency.

89. On October 22, 2003, Nichols filed an appeal with the Merit Systems Protection Board from the action of the Bureau of Prisons in removing him from his position of Administrative Management Specialist at the Bureau of Prisons, Federal Medical Center, Devens, Massachusetts, effective September 22, 2003. Included within that appeal Nichols asserted that the Bureau of Prisons violated the Rehabilitation Act of 1973, retaliated against him for his protected EEO duties, failed to support two hardship requests, and that the Bureau of Prisons could have provided interim relief 5 CFR subsection 1201.111(c).

90. Nichols alleged, inter alia, that he had been discriminated against on the basis of his "disability." It was Nichols' position that he could safely perform the essential elements of his job without any accommodation. Furthermore, even if it were true that Nichols could not do such safely, Nichols could have safely performed the essential elements of his job had he been provided any of several reasonable accommodations, which the Agency unlawfully denied him.

91. Reasonable accommodations to Nichols' disability were readily available. The Bureau of Prisons could have relocated his position from inside the secure area of the Federal Medical Center to any of a number of sites outside the secure area of the Federal Medical Center.

92. A hearing on the MSPB case was held before the Boston Field Office of the Merit Systems Protection Board on January 29, 2004. Administrative Judge Catherine A. Armstrong issued the Initial Decision on February 20, 2004. The Decision became final on March 26, 2004. The Equal Employment Opportunity Commission issued its Decision on May 13, 2004. That decision was received by plaintiff on May 17, 2004.

93. Based on the foregoing, the Agency violated Rehabilitation Act of 1973, including 29 C.F.R.

Part 1614.

**WHEREFORE** plaintiff demands:

A. Judgment against the defendant;

B. Reinstatement;

C. All lost moneys and benefits;

D. Compensatory damages;

E. Liquidated damages;

F. Punitive damages;

G. Attorney's fees;

H. Interest and costs; and

I. Any other remedy this Court deems meet and just.

Kenneth L. Nichols
By his attorney

*Scott A. Lathrop*
Scott A. Lathrop, Esq.
Scott A. Lathrop & Associates
122 Old Ayer Road
Groton, MA 01450
(978) 448-8234
BBO No. 287820

Dated: June 16, 2004

**PLAINTIFF REQUESTS A JURY TRIAL**