UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C. A. No.   04-11341 PBS

```
*******************************
KENNETH L. NICHOLS,             *
        Plaintiff               *
                                *
                                *
        v.                      *
                                *
JOHN ASHCROFT,                  *
ATTORNEY GENERAL,               *
DEPARTMENT OF JUSTICE,          *
        Defendant               *
*******************************
```

## JOINT PRETRIAL MEMORANDUM

Plaintiff Kenneth L. Nichols hereby files this "Joint" Pretrial Memorandum, as required by this Court's Order of October 18, 2005.  Counsel for defendant was invited several weeks ago to join in the preparation of this Memorandum, but for reasons unknown has failed to do so.  Hence this "Joint" Pretrial Memorandum is being filed solely by Plaintiff.

1.      Summary of the Evidence

    a.      Plaintiff

        i.      Kenneth L. Nichols served for ten years with the United States Army.  After his discharge, Nichols was awarded a service connected disability rating of 10%, effective December, 1991.  The basis for his disability was Tarsal Tunnel Syndrome in both feet.  Effective June, 1997, his disability rating was increased to 30% due to increased aggravation of foot pain and migraine

1

headaches.   Effective December, 2002, it was increased to a rating of 60% disabled with a compensation rate of 50%.

ii.     Nichols began employment with the Federal Bureau of Prisons effective September 22, 1991. The Bureau of Prisons understood and considered Nichols to be a "disabled veteran."

iii.    Federal Medical Center Devens is located in Devens, Massachusetts.   It is part of the Bureau of Prisons.  FMC Devens is a large facility with a camp adjacent to the institution and a warehouse several miles away.

iv.     In his last position at FMC Devens Nichols served as the Volunteer Coordinator.  The Position Description for Nichols' job lists the Physical Demands as being "mostly sedentary.  Some walking, bending and lifting will be required." The position was located in the Health Services Unit, which is within the secure area of the Federal Medical Center.

v.      Many departments and positions at the Federal Medical Center, however, are located outside the secure area of the institution, including the Human Resources Department, the Business Office, the Warden's Office, the Legal Services Department, the Employee Development Staff and the Institution Mail Room.

vi.     Nichols' Position Description says he is "charged with responsibility for maintaining security of the institution."  This responsibility appears in all position descriptions at the Medical Center as well as all position descriptions for the entire Bureau regardless of where the positions are

2

physically located.

vii.    In fact, however, the obligation to maintain security varies according to the job location.  Staff in the administrative buildings are required to respond only by going to the control room sally port area (the entrance to the secure area) and wait there, if needed.  Staff in the administrative buildings are not obligated to go into the secure area of the institution.  This is true also for the Human Resources staff, the Business Office staff, the Warden's Office staff, and the Legal Department staff and the Warehouse staff, the latter two being located 4.5 miles away from the institution.  Similarly, the Employee Development Department staff does not need to respond inasmuch as they are located in the Staff Training Center adjacent to the camp facility approximately a quarter of a mile from the institution.

viii.    While Nichols was at FMC Devens, he has been called upon to respond to emergencies only on a very limited number of occasions.

ix.    On August 1, 2000, Nichols underwent foot/ankle surgery for Tarsal Tunnel Release, due to the military injury for which he had been receiving disability compensation.  The surgery caused Nichols to be out for work from August 1, 2000, to December 14, 2000.

x.    When Nichols returned to work, he was placed in a temporary limited duty status.  He was assigned to the Business Office.

xi.    In this "limited duty" status Nichols was able to perform all of his regular duties.  He simply was not permitted to enter secure areas of institution,

which "limitation" did not prevent him from performing all of his regular job duties. This practice is fairly standard.

xii.　On February 4, 2002, Nichols was issued a proposal letter for removal based upon the Bureau allegation of his being physically unable to perform the duties of his position since 8/7/00.

xiii.　On March 14, 2002, Nichols sent a rebuttal to this proposed removal. In his rebuttal Nichols contended that he could perform the essential elements of his position in that the ability to run is not an essential element of his position. Even so, he contended that he could perform that task as the need arose. If he did this task, he would only suffer increased pain; there was no risk of further injury. The pain would not cause any permanent change in his condition. Nichols also asked for reasonable accommodations; he wanted to be reassigned, promoted, if necessary paid any and all costs for his relocation, or placed outside the secure areas of institution, where as a practical matter the need to respond does not exist.

xiv.　On June 19, 2002, John Harris, III, M.D., released Nichols to full duty, and Nichols returned to full duty status within the secure area of the institution. The issue as to Nichols' removal thereby became moot.

xv.　On Saturday, December 21, 2002, while walking en route to the Staff Training Center (on Government Property), Nichols slipped and fell on "Black Ice" while carrying files and equipment weighing approximately 45 to 50 pounds, at which time he suffered work-related-injuries to his lower

4

back region and left thumb.

xvi.    On January 6, 2003, Nichols returned to work and was placed on limited duty status.  Nichols was again assigned to work in the Business Office.  As stated, this is outside the secure area of the institution where Nichols was not required to respond to emergencies.  Again, Nichols could and did perform from the Business Office all of his day to day duties as the Volunteer Coordinator, EEO Counselor, and Health Services Contract Program Manager.

xvii.   On January 31, 2003, Nichols was advised that his limited duty assignment would be effective until he was re-evaluated by his physician on February 10, 2003.

xviii.  On July 16, 2003, Nichols was advised that his limited duty status would be terminated on August 5, 2003.   The letter from Matthew Langford, Acting, Executive Assistant, (Nichols' recently appointed immediate supervisor) included the following statement: "You can substantiate your current medical status by either seeing the institution physician or providing documentation from your personal physician, or both.  You are not however, required to see either of these physicians."

xix.    Between January 6, 2003, and July 16, 2003, Nichols' physical condition and his ability to do his job had not changed.

xx.     On July 22, 2003, Nichols provided the Bureau of Prisons with an updated medical report from Dr. Ayers.  Dr. Ayers' letter included the following

5

statements:

"The patient injured his back on the 21st of December, 2002, after a slip and fall while carrying a 50 lb. Box at work. The patient has undergone an MRI which looked quite good. <u>We are awaiting an electromyogram to see if indeed there are any neurologic issues. He does have a history of bilateral tarsal tunnel which is also giving him a problem. The patient's symptoms are primarily pain and limited motion with a presumptive diagnosis of sciatica.</u> There is no expected date of full or partial recovery, with the patient not showing any improvement with all conservative management and no indication for need for surgery. <u>The patient's pain does appear to have an impact on the patient's life, in that in his job as a prison guard, he really could not defend himself or pull people away from a hazardous area. The patient is also limited in what he is able to do at home.</u> I cannot give a narrative explanation of medical basis for any conclusion that the medical condition has become well stabilized. I think an electromyogram will give us an idea as to whether or not this is a neurologic issue. <u>The patient has fairly limited motion with difficulty walking, so he would be incapacitated during a period of increased physical activity, such as would be required by his job as a prison guard.</u>"

xxi.   Despite Dr. Ayers' notation, Nichols was not a prison guard, and Warden Winn was fully aware of this when he read this letter.

xxii.   Nichols' physical condition and limitations have not changed regarding his leg and pain since Dr. Harris released Nichols to return to work.

xxiii.   On August 21, 2003, Nichols was issued a proposal letter to be removed from his position as Administrative Management Specialist, GS-301-11, for the charge of Physical/Medical Inability to Perform the Duties of his Position. In this proposed removal Warden Winn claimed that "every employee in a correctional institution must be able to respond to emergencies immediately and must be able to assist in the resolution of the emergency."

xxiv.   In fact, not all employees at the Medical Center have to respond in the manner that Correctional Officers might have to respond to an emergency.

xxv.    When Nichols was given the letter of proposed removal, he was informed by Matt Langford, Acting Executive Assistant, as Nichols' recently appointed immediate supervisor, that Nichols must immediately depart the grounds of FMC Devens per the order of Warden Winn.

xxvi.   Nichols requested administrative leave.  Langford instead gave Nichols the option of either taking annual leave, sick leave or leave without pay.  Nichols opted to utilize his own leave in order to maintain a paycheck.  Nichols stayed on his own annual leave until approximately September 22, 2003, when it ran out.

xxvii.  On August 21, 2003, Nichols provided a response to the proposed removal action.  In this response Nichols requested, inter alia, that his position be relocated to the Staff Training Center or the Institution Warehouse Building, specifically in the vacant administrative office next to the Legal Services Department, as an accommodation because these are Agency areas where there are no prisoners other than for temporary sanitation duties (i.e., to empty trash and/or vacuum the floors).

xxviii. Nichols also requested additional time to respond.  Without explanation, Warden Winn denied that request despite the fact that Dr. Ayers had written: "We are awaiting an electromyogram."

xxix.   On August 22, 2003, Warden Winn also denied Nichols' request for accommodation. Warden Winn claimed that the request was "not a reasonable accommodation that would enable you to perform the essential

7

functions of your position, i.e., responding to emergencies."

xxx.   Neither Warden nor anyone on his behalf ever engaged in any discussion with Nichols about alternate kinds of accommodations.

xxxi.   Warden Winn did not have Nichols examined by another physician. Neither did Warden Winn review the physical requirements for Nichols' position as listed in his job description before he removed Nichols from his position.

xxxii.  By letter dated September 18, 2003, Nichols was removed from his position with the Bureau of Prisons, effective September 22, 2003, by David L. Winn, Warden. In this removal Warden Winn asserted that: "There are no positions with the Federal Medical Center where you would not present a risk to your safety or the safety of others."

xxxiii. However, there were several vacant offices in the Warden's area and in the Administrative Office area, all of which are located outside the secure area of the institution. Nichols could have been moved there. Also, the position of Employee Development Specialist, located in the Staff Training Center within the employee development staff was vacant, and Nichols was qualified for this position.

xxxiv.  On September 22, 2003, Nichols resubmitted another request for Reasonable Accommodation on DOJ Form 100A. Nichols was not able to deliver the document until approximately 4:10 p.m. that day. However, Nichols had earlier called the Acting Personnel Officer named Lisa Albee and informed her that he was attempting to deliver the document prior to 4:00 p.m.

Nichols managed to deliver it to Albee while she was still within the FMC
Devens parking lot.

xxxv.  Nevertheless, by letter dated September 25, 2003, Warden denied this last
request as being filed too late.

xxxvi.  Effective September 22, 2003, Nichols was removed from his position as
Administrative Management Specialist, GS-301-11, Step 5, for the following
charge: Physical/Medical Inability to Perform the Duties of his Position.

b.    Defendant

2.    Facts That Should Not Be Contested By Defendant

a.    Kenneth L. Nichols served for ten years with the United States Army working within
the Human Resources arena. His primary military occupation and title at the time
of his separation was 75B20, Personnel Administration Specialist. His dates of
service were from September 3, 1981, to October 31, 1991, when he received an
Honorable Discharge.

b.    After his discharge, Nichols was awarded a service connected disability rating of
10%, effective December, 1991. The basis for his disability was Tarsal Tunnel
Syndrome in both feet. This caused Nichols to have constant pain in his feet
radiating up his legs. Effective June, 1997, his disability rating was increased to

30% due to increased aggravation of foot pain and migraine headaches.  Effective December, 2002, it was increased to a rating of 60% disabled with a compensation rate of 50%.  His condition continues to this day – pain in his feet and migraine headaches.

c.    Nichols began employment with the Federal Bureau of Prisons effective September 22, 1991.

d.    The Bureau of Prisons has an affirmative action obligation to hire and promote disabled veterans like Nichols.

e.    The Bureau of Prisons understood and considered Nichols to be a "disabled veteran."

f.    During his service with the Bureau of Prisons Nichols has held the following positions and grade levels within the Agency:

Correctional Officer, GS-007-6, from September 23, 1991, to March 21, 1992, at FCI Tallahassee, Florida;

Correctional Officer, GS-007-7, from March 22, 1991, to May 16, 1992;

Inmate Systems Officer, GS-007-7, from May 17, 1992, to October 1, 1994;

Human Resource Specialist (Trainee), GS-201-7, from October 2, 1994, to March 2, 1996,  at FCI Texarkana, Texas;

Human Resource Specialist, GS-201-9, from March 3, 1996, to April 25, 1998, at FMC Forth Worth, Texas;

Assistant Human Resource Manager, GS-201-11, from April 26, 1998, to August 14, 1999,  at FMC Devens, Massachusetts;

Administrative Management Specialist, GS-301-11, from August 15, 1999,

and thereafter at FMC Devens, Massachusetts.

g.      Nichols served as a Corrections Officer despite his disability.  At no time did Nichols' disability prevent him from performing his day to day duties in any of the above positions.

h.      Federal Medical Center Devens is located in Devens, Massachusetts.   It is part of the Bureau of Prisons.

i.       David L. Winn is the Warden for Federal Medical Center Devens.  He has held that position for the last three years. He arrived at FMC Devens approximately two years after it was opened.

j.       FMC Devens is a large facility with a camp adjacent to the institution and a warehouse several miles away.

k.      In his last position at FMC Devens Nichols served as the Volunteer Coordinator.  On a day to day basis Nichols was in charge of all aspects of administering the volunteer program for the institution, as well as maintaining the medical staff contractors for the Health Services Unit of the institution.  Other collateral duties included EEO and affirmative action.

l.       The Position Description for Nichols' job lists the Physical Demands as being "mostly sedentary.  Some walking, bending and lifting will be required."

m.      Nichols was the only person in this position.  The Position Description was in fact drafted for him.  The position was located in the Health Services Unit, which is within the secure area of the Federal Medical Center.

n.      Many departments and positions at the Federal Medical Center, however, are located

11

outside the secure area of the institution, including the Human Resources Department, the Business Office, the Warden's Office, the Legal Services Department, the Employee Development Staff and the Institution Mail Room.

o.    Nichols' Position Description says he is "charged with responsibility for maintaining security of the institution." This responsibility appears in all position descriptions at the Medical Center as well as all position descriptions for the entire Bureau regardless of where the positions are physically located.

p.    On August 1, 2000, Nichols underwent foot/ankle surgery for Tarsal Tunnel Release, due to the military injury for which he had been receiving disability compensation. This surgery was for a release trying to alleviate some of the pain he was experiencing. The surgery caused Nichols to be out for work from August 1, 2000, to December 14, 2000.

q.    During his absence from work Nichols utilized his own annual and sick leave accrual balances, employee donations and donations from the Department of Justice Leave Bank in order to cover his period of absence.

r.    When Nichols returned to work, he was placed in a temporary limited duty status. He was assigned to the Business Office. Prior to that he was working in the Health Services Unit inside the secure area of the institution.

s.    In this "limited duty" status Nichols was able to perform all of his regular duties. He simply was not permitted to enter secure areas of institution, which "limitation" did not prevent him from performing all of his regular job duties.

t.    On February 4, 2002, Nichols was issued a proposal letter for removal based upon

the Bureau allegation of his being physically unable to perform the duties of his position since 8/7/00.

u.     On March 14, 2002, Nichols sent a rebuttal to this proposed removal.  In his rebuttal Nichols contended that he could perform the essential elements of his position in that the ability to run is not an essential element of his position; over the years the instances when Nichols had to run in order to respond to emergencies had been extremely limited in number.  Even so, he contended that he could perform that task as the need arose.  If he did this task, he would only suffer increased pain; there was no risk of further injury.  The pain would not cause any permanent change in his condition.

v.     In his rebuttal Nichols also asked for reasonable accommodations; he wanted to be reassigned, promoted, if necessary paid any and all costs for his relocation, or placed outside the secure areas of institution, where as a practical matter the need to respond does not exist.  During Nichols' career at FMC Devens the staff outside the secure area of the institution have never had to enter the secure area to respond to emergencies.

w.     On June 19, 2002, John Harris, III, M.D., released Nichols to full duty with the aid of venous support hose and/or pneumatic stirrup on his left ankle, and Nichols returned to full duty status within the secure area of the institution.  The issue as to Nichols' removal thereby became moot.

x.     On Saturday, December 21, 2002, while walking en route to the Staff Training Center (on Government Property), Nichols slipped and fell on "Black Ice" while

carrying files and equipment weighing approximately 45 to 50 pounds, at which time he suffered work-related-injuries to his lower back region and left thumb.

y.    On January 6, 2003, Nichols returned to work and was placed on limited duty status.

z.    Nichols was again assigned to work in the Business Office. As stated, this is outside the secure area of the institution where Nichols was not required to respond to emergencies. Again, Nichols could and did perform from the Business Office all of his day to day duties as the Volunteer Coordinator, EEO Counselor, and Health Services Contract Program Manager.

aa.    On January 31, 2003, Nichols was advised that his limited duty assignment would be effective until he was re-evaluated by his physician on February 10, 2003.

ab.    On July 16, 2003, Nichols was advised that his limited duty status would be terminated on August 5, 2003.    The letter from Matthew Langford, Acting, Executive Assistant, (Nichols' recently appointed immediate supervisor) included the following statement: "You can substantiate your current medical status by either seeing the institution physician or providing documentation from your personal physician, or both.  You are not however, required to see either of these physicians."

ac.    On July 22, 2003, Nichols provided the Bureau of Prisons with an updated medical report from Dr. Ayers.  Dr. Ayers' letter included the following statements:

> "The patient injured his back on the 21st of December, 2002, after a slip and fall while carrying a 50 lb. Box at work.  The patient has undergone an MRI which looked quite good. We are awaiting an electromyogram to see if indeed there are any neurologic issues.  He does have a history of bilateral tarsal tunnel which is also giving him a problem.  The patient's symptoms are primarily pain and limited motion with a presumptive diagnosis of sciatica. There is no expected date of full or partial recovery, with the patient not showing any improvement with all conservative management and no

14

indication for need for surgery. <u>The patient's pain does appear to have an impact on the patient's life, in that in his job as a prison guard, he really could not defend himself or pull people away from a hazardous area. The patient is also limited in what he is able to do at home.</u> I cannot give a narrative explanation of medical basis for any conclusion that the medical condition has become well stabilized. I think an electromyogram will give us an idea as to whether or not this is a neurologic issue. <u>The patient has fairly limited motion with difficulty walking, so he would be incapacitated during a period of increased physical activity, such as would be required by his job as a prison guard.</u>"

ad.    Despite Dr. Ayers' notation, Nichols was not a prison guard, and Warden Winn was fully aware of this when he read this letter.

ae.    On August 21, 2003, Nichols was issued a proposal letter to be removed from his position as Administrative Management Specialist, GS-301-11, for the charge of Physical/Medical Inability to Perform the Duties of his Position.

af.    In this proposed removal Warden Winn claimed that "every employee in a correctional institution must be able to respond to emergencies immediately and must be able to assist in the resolution of the emergency."

ag.    When Nichols was given the letter of proposed removal, he was informed by Matt Langford, Acting Executive Assistant, as Nichols' recently appointed immediate supervisor, that Nichols must immediately depart the grounds of FMC Devens per the order of Warden Winn.

ah.    Nichols requested administrative leave. Langford instead gave Nichols the option of either taking annual leave, sick leave or leave without pay. Nichols opted to utilize his own leave in order to maintain a paycheck. Nichols stayed on his own annual leave until approximately September 22, 2003, when it ran out.

ai.    On August 21, 2003, Nichols provided a response to the proposed removal action.

15

In this response Nichols requested, underline alia, that his position be relocated to the Staff Training Center or the Institution Warehouse Building, specifically in the vacant administrative office next to the Legal Services Department, as an accommodation because these are Agency areas where there are no prisoners other than for temporary sanitation duties (i.e., to empty trash and/or vacuum the floors).

aj.    Nichols also requested additional time to respond. Warden Winn denied that request.

ak.    On August 22, 2003, Warden Winn also denied Nichols' request for accommodation. Warden Winn claimed that the request was "not a reasonable accommodation that would enable you to perform the essential functions of your position, i.e., responding to emergencies."

al.    Neither Warden nor anyone on his behalf ever engaged in any discussion with Nichols about alternate kinds of accommodations.

am.    FMC Devens has a Chief Medical Officer. Warden Winn normally gets the Chief Medical Officer involved in providing advice as to what is the best position in which to place an injured employee who cannot respond to emergencies. Warden Winn did not have Nichols examined by another physician.

an.    By letter dated September 18, 2003, Nichols was removed from his position with the Bureau of Prisons, effective September 22, 2003, by David L. Winn, Warden. In this removal Warden Winn asserted that: "There are no positions with the Federal Medical Center where you would not present a risk to your safety or the safety of others."

ao.    On September 22, 2003, Nichols resubmitted another request for Reasonable

Accommodation on DOJ Form 100A. Nichols was not able to deliver the document until approximately 4:10 p.m. that day.

ap.    By letter dated September 25, 2003, Warden denied this last request as being filed too late.

aq.    Effective September 22, 2003, Nichols was removed from his position as Administrative Management Specialist, GS-301-11, Step 5, for the following charge: Physical/Medical Inability to Perform the Duties of his Position.

ar.    Nichols was not accepted to the periodic rolls of worker's compensation until October 3, 2003.


3.    Contested Facts

a.     At no time did Nichols' disability prevent him from performing his day to day duties in any of the his positions.

b.    The obligation to maintain security varies according to the job location.

c.    While Nichols was at FMC Devens, he has been called upon to respond to emergencies only on a very limited number of occasions.

d.    In this "limited duty" status Nichols simply was not permitted to enter secure areas of institution, which "limitation" did not prevent him from performing all of his regular job duties. However, when it was convenient for management, he was allowed to enter inside the secure confines of the institution just past the control sally port into the inmate Visiting Room in order to conduct, monitor and supervise quarterly blood drives. Nichols did not otherwise have to go inside the secure area

of the institution in order to perform his normal duties as a Volunteer Coordinator.

e.    This practice is fairly standard.  Under FMC Devens' limited duty program, employees who have physical limitations are simply placed in locales where the likelihood of having to respond to an emergency was diminished.

f.    Assigning Nichols to the Business Office, not just reduced, but eliminated the likelihood that Nichols would have to respond to an emergency.

g.    Between January 6, 2003, and July 16, 2003, Nichols' physical condition and his ability to do his job had not changed.

h.    Nichols' physical condition and limitations have not changed regarding his leg and pain since Dr. Harris released Nichols to return to work.  On some days, the pain is not as excruciating as others; on some days Nichols is fine, and on other days he is in pain, depending on the weather.  It still is the case that if Nichols were required to run or grapple with someone, he would merely experience increased pain, which would lessen after a time.

i.    Warden Winn proposed removing Nichols because he "felt" that Nichols couldn't respond to emergencies if one arose in the institution.  In Warden Winn's  mind, it was essential, if they had an emergency, that Nichols would have to respond. In fact, in his opinion, the primary job function of all Bureau of Prison employees is to respond to emergencies.

j.    In fact, not all employees at the Medical Center have to respond in the manner that Correctional Officers might have to respond to an emergency.  This is true of the Warden's Office, the Business Office, Human Resources, the Warehouse staff, the

Garage staff, the Legal Office staff, the Mail Room staff, and the Employee Development Staff/Staff Training Center.

k.    When Nichols was removed from his position, there were several vacant offices in the Warden's area and in the Administrative Office area, all of which are located outside the secure area of the institution.  Nichols could have been moved there.

l.    Also, the position of Employee Development Specialist, located in the Staff Training Center within the employee development staff was vacant, and Nichols was qualified for this position.

m.    Nichols during his career at the Federal Medical Center has almost never had to grapple with a prisoner.  Only a few times has he had to even run, or walk quickly, toward the sally port.  And on the few occasions that has occurred, he has been "called down."

n.    Administrative employees seldom, if ever, have been required to run and grapple with prisoners.   This function is not even required or expected of persons based away from the institution.

o.    Given Nichols' medical condition and the nature of his work involved, there is little probability that his condition may result in injury to himself or others.

p.    If Nichols were required to run and grapple with prisoners, he would experience greater pain than he normally experiences on a day-to-day basis.  However, he would suffer no injury, permanent or otherwise.

q.    Reasonable accommodations to Nichols' disability were readily available.  The Bureau of Prisons could have relocated his position from inside the secure area of the

19

Federal Medical Center to any of a number of sites outside the secure area of the Federal Medical Center.

r.    Nichols' damages.

4.    Jurisdictional Questions

None

5.    Pending Motions

None

6.    Issues of Law

a.    Whether Nichols is a "disabled person" who has a physical or mental impairment that substantially limits one or more of the major life activities – walking, who has record of such an impairment, and/or who was regarded as having such an impairment.   Calero-Cerezo v. U.S. Department of Justice, 355 F.3d 6, 20 (1st Cir. 2004); Carroll v. Xerox Corp., 294 F.3d 231, 237 (1st Cir. 2002); Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 264 (1st Cir. 1999); 42 U.S.C. § 12102(2); 29 C.F.R. § 1630.2(g)

b.    Whether The Bureau of Prisons regarded Nichols as having a substantially limiting impairment that he, in fact, lacked or that Nichols had a substantially limiting impairment when the impairment is not so limiting.  Sutton v. United Air Lines, 527 U.S. 471, 489 (1999)

c.      Whether the Bureau of Prisons made a good faith, individualized inquiry into Nichols' impairment, sufficient to inform itself of his limitations.  Gillen v. Fallon Ambulance Service, Inc., 283  F.3d 11, 23 (1st Cir. 2002); .  Garcia-Ayala v. Lederle Parenterals, Inc., 212 F.3d 638, 647  (1st Cir. 2000)

d.      Whether the Bureau of Prison's assumptions about Nichols' disability were unreasonable and not based upon a good-faith assessment of Nichols' capabilities. Sutton v. United Air Lines, 527 U.S. 471, 489 (1999)

e.      Whether Nichols could perform the essential functions of the job, with or without reasonable accommodation. 42 U.S.C. § 12111(8); 29 C.F.R. § 1630.2(n)(1); Calero-Cerezo v. U.S. Department of Justice, 355 F.3d 6, 22 (1st Cir. 2004);  Gillen v. Fallon Ambulance Service, Inc., 283 F.3d 11, 24-25 (1st Cir. 2002); Ward v. Mass. Health Research Inst., 209 F.3d 29, 34 (1st Cir. 2000)

f.      Whether responding to emergencies by running and grappling with prisoners is not an essential function of Nichols' position or of all other positions at the Federal Medical Center. 42 U.S.C. § 12111(8); 29 C.F.R. § 1630.2(n)(1);  Calero-Cerezo v. U.S. Department of Justice, 355 F.3d 6, 22 (1st Cir. 2004);   Gillen v. Fallon Ambulance Service, Inc., 283 F.3d 11, 24-25 (1st Cir. 2002); Ward v. Mass. Health Research Inst., 209 F.3d 29, 34 (1st Cir. 2000)

g.      Whether the Bureau of Prisons provided reasonable accommodations to Nichols' physical limitations.  42 U.S.C. s. 12102 (2); 42 U.S.C. § 12111(9)(B); 29 C.F.R. § 1630.2(j)(3)(i); 29 C.F.R.   1630.2(o)(1)(iii); 29 C.F.R. § 1630.2(o)(3); Toyota Motor Mfg., Kentucky, Inc. v. Williams, 534 U.S. 184 (2002); Calero-Cerezo v. U.S.

Department of Justice, 355 F.3d 6, 23  (1st Cir. 2004); Reed v. LePage Bakeries, Inc.,

244 F.3d 254, 259 (1st Cir. 2001);  Garcia-Ayala v. Lederle Parenterals, Inc., 212

F.3d 638, 647  (1st Cir. 2000); Ward v. Massachusetts Health Research Institute, Inc.,

209 F.3d 29, 36 (1st Cir. 2000); Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d

252, 264 (1st Cir. 1999); Jacques v. Clean-Up Group, Inc., 96 F.3d 506, 515 (1st Cir.

1996).

h.     Whether the Bureau of Prisons failed/refused to enter into an interactive process with

Nichols to determine an appropriate accommodation.  Gillen v. Fallon Ambulance

Service, Inc., 283  F.3d 11, 23 (1st Cir. 2002); .  Garcia-Ayala v. Lederle Parenterals,

Inc., 212 F.3d 638, 647  (1st Cir. 2000)

i.     Whether reasonable accommodations to Nichols' disability were readily available.

42 U.S.C. s. 12102 (2); 42 U.S.C. § 12111(9)(B); 29 C.F.R. § 1630.2(j)(3)(i); 29

C.F.R. § 1630.2(o)(1)(iii); 29 C.F.R. § 1630.2(o)(3); Toyota Motor Mfg., Kentucky,

Inc. v. Williams, 534 U.S. 184 (2002); Calero-Cerezo v. U.S. Department of Justice,

355 F.3d 6, 23  (1st Cir. 2004); Reed v. LePage Bakeries, Inc., 244 F.3d 254, 259 (1st

Cir. 2001);  Garcia-Ayala v. Lederle Parenterals, Inc., 212 F.3d 638, 647  (1st Cir.

2000); Ward v. Massachusetts Health Research Institute, Inc., 209 F.3d 29, 36 (1st

Cir. 2000); Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 264 (1st Cir.

1999); Jacques v. Clean-Up Group, Inc., 96 F.3d 506, 515 (1st Cir. 1996).

j.     Whether there was an undue hardship that prevented the defendant from reasonably

accommodating Nichols.  42 U.S.C. s. 12111(10); 42 U.S.C. s. 12112(b)(5)(A).

k.     Whether the Bureau of Prisons violated the Rehabilitation Act of 1973.  29 U.S.C.

§791 <u>et seq.</u>; 42 U.S.C. § 12112(b)(5)(A); <u>Calero-Cerezo v. U.S. Department of Justice</u>, 355 F.3d 6, 19-20 (1st Cir. 2004); <u>Garcia-Ayala v. Lederle Parenterals, Inc.</u>, 212 F.3d 638, 646 n.9 (1st Cir. 2000).

7.    <u>Requested Amendments to the Pleadings</u>

None

8.    <u>Additional Matters</u>

None

9.    <u>Probable Length of Trial</u>

Five days

10.    <u>Witnesses</u>

a.    <u>Plaintiff</u>

Kenneth L. Nichols

David L. Winn
Federal Bureau of Prisons

Cynthia A. Lord
Federal Bureau of Prisons

Michael Sheridan
Federal Bureau of Prisons

Mark Shaunessy
Federal Bureau of Prisons

Adrian Guerrero
Federal Bureau of Prisons

b.      Defendant

11.     Proposed Exhibits

a.      Plaintiff

    i.      Position Description, Administrative Management Specialist

    ii.     January 24, 2001, memorandum from David L. Winn, Warden, to Kenneth
            Nichols

    iii.    December 18, 2001, letter from John M. Harris, III, M.D., to Whom It May
            Concern

    iv.     February 4, 2002, letter from Jerry Martinez, Associate Warden, Operations,
            to Kenneth Nichols

    v.      February 4, 2002, letter from Cynthia A. Lord, Human Resources Manager,
            to Kenneth Nichols

    vi.     February 4, 2002, letter from Kenneth L. Nichols to David L. Winn, Warden

    vii.    March 14, 2002, letter from Kenneth L. Nichols to David L. Winn, Warden

    viii.   March 19, 2002, Memorandum for File from Cynthia A. Lord, Human
            Resources Manager

    ix.     3/20/02 letter from Scott A. Lathrop to David L. Winn, Warden, to Mr.
            Kenneth Nichols

    x.      June 19, 2002, letter from John M. Harris, III, M.D., to Whom It May
            Concern

xi.     June 28, 2002, Memorandum from Sandra L. Howard, M.D., to David Winn, Warden FMC Devens

xii.    January 6, 2003, letter from David L. Winn, Warden, to Mr. Kenneth Nichols

xiii.   January 10, 2003 Disability Certificate

xiv.    January 24, 2003 Disability Certificate

xv.     January 31, 2003, letter from David L. Winn, Warden, to Mr. Kenneth Nichols

xvi.    March 20, 2003, Disability Certificate

xvii.   4/23/03 Return to Work Medical Status

xviii.  July 15, 2003, note from Heywood Hospital

xix.    7/15/03 Disability Certificate from John B. Ayers, MD

xx.     July 16, 2003, letter from Matthew Lanford, Acting Executive Assistant, to Mr. Kenneth Nichols

xxi.    July 22, 2003, letter from John B. Ayers, M.D., to U.S. Department of Justice

xxii.   August 19 Disability Certificate from John B. Ayers, MD

xxiii.  August 21, 2003, letter from Matthew Lanford, Acting Executive Assistant, to Mr. Kenneth Nichols

xxiv.   August 21, 2003, letter from Kenneth L. Nichols to Mr. David L. Winn

xxv.    August 22, 2003, letter from David L. Winn, Warden, to Mr. Kenneth Nichols

xxvi.   September 18, 2003, letter to Mr. Kenneth Nichols

xxvii.  Nichols DOJ Form 100A Request for Reasonable Accommodation, dated September 22, 2003

xxviii. September 25, 2003, letter from David L. Winn, Warden, to Kenneth Nichols

xxix.   09/08/03 DOJ Form 100A, Request for Reasonable Accommodations, John

B. Ayers, M.D.

xxx.    12/30/03 Work Capacity Evaluation, John B. Ayers, M.D.

xxxi.   Drawing of FMC Devens

xxxii.  Picture of FMC Devens

12.    <u>Remaining Objections to Evidence</u>

None

Kenneth L. Nichols
By his attorney

_____
Scott A. Lathrop, Esq.
Scott A. Lathrop & Associates
122 Old Ayer Road
Groton, MA 01450
(978) 448-8234
BBO No. 287820

Dated:   January 11, 2006

<u>Certificate of Service</u>

I, Scott A. Lathrop, hereby certify that I have served the foregoing "Joint" Pretrial Memorandum
on the defendant by mailing this day a copy to the last known address of its Attorney of Record.

_____
Scott A. Lathrop

Dated:  January 11, 2006